UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JONATHAN GOODIE** | **CIVIL ACTION** |
| **VERSUS** | **No. 13-5228** |
| **EXXONMOBILE OIL CORPORATION ET AL.** | **SECTION I** |

## ORDER AND REASONS

Before the Court is a motion[1] by defendant West Coast Logistics, LLC ("WCL") for summary judgment. Also before the Court is a motion[2] by defendant ExxonMobil Oil Corporation ("Exxon") for summary judgment. Plaintiff filed a single opposition,[3] to which both defendants replied separately.[4] With leave of Court,[5] plaintiff filed a supplemental memorandum relative to Paul Ingle's testimony[6] and a supplemental memorandum relative to certain discovery responses.[7] Both defendants separately replied to the supplemental memoranda.[8] For the following reasons, the motions are **GRANTED**.

---

[1] R. Doc. No. 54.
[2] R. Doc. No. 63.
[3] R. Doc. No. 69.
[4] R. Doc. No. 76; R. Doc. No. 77.
[5] R. Doc. No. 80.
[6] R. Doc. No. 83.
[7] R. Doc. No. 85.
[8] R. Doc. No. 87; R. Doc. No. 88; *see also* R. Doc. No. 89.

**BACKGROUND**

On May 23, 2013, plaintiff, Jonathan Goodie, an employee of Weatherford International, Ltd. ("Weatherford"),[9] was working as a plug and abandonment technician[10] aboard the Lena, a fixed tower oil platform permanently attached to the sea floor off the coast of Louisiana.[11] Exxon owned the platform, and a division of Exxon contracted with Weatherford to perform various services aboard the Lena.[12] Exxon also contracted with WCL to provide for cost tracking and logistics support, as well as a safety observer, also called a safety adviser, on the platform.[13]

Construed in the light most favorable to plaintiff, the facts are as follows. On May 23, 2013, two Weatherford crew supervisors, Shane Comeaux ("Comeaux") and Shad Delhomme ("Delhomme"),[14] were on the top deck with plaintiff and John Bourgeois ("Bourgeois"), a Weatherford crew chief.[15] Bourgeois's position as crew chief placed him above plaintiff in the Weatherford hierarchy.[16] The Weatherford crew supervisors directed plaintiff and Bourgeois to remove a tree cap in the lower well bay.[17] After the tree cap was removed, a wireline lubricator was

---

[9]R. Doc. No. 69-7, ¶ 1, R. Doc. No. 63-8, ¶¶ 6-8.
[10]R. Doc. No. 32, at 2; R. Doc. No. 69-7, at 1; R. Doc. No. 54-6, at 15 (Deposition of Jonathan Goodie).
[11]R. Doc. No. 63-8, ¶ 1; R. Doc. No. 69-7, ¶¶ 3-5.
[12]R. Doc. No. 63-8, ¶ 6.
[13]R. Doc. No. 54-3, at 2 (Affidavit of Glenn Davis, WCL's operations manager); R. Doc. No. 83, at 2; R. Doc. No. 85, at 16.
[14]R. Doc. No. 54-6, at 9-10. Plaintiff testified that, although the two men had the same title, Shane Comeaux was at the top of the chain of Weatherford employees based on his greater experience. R. Doc. No. 54-6, at 41.
[15]R. Doc. No. 54-6, at 11-12.
[16]R. Doc. No. 54-6, at 20.
[17]R. Doc. No. 54-6, at 8-10. The tree cap, also called a flange, needed to be removed from the well to conduct wireline operations. R. Doc. No. 54-6, at 10, 12, 40 ; R. Doc. No. 54-1, at 4. When in place, the tree cap's purpose was to maintain stability in the well by sealing it off. R. Doc. No. 54-6, at 40; R. Doc. No. 76-3, at 28.

to be lowered in by crane.[18] Paul Ingle ("Ingle"), who was also on the top deck, was WCL's safety adviser on duty.[19] Johnny Goodwin ("Goodwin") was Exxon's "company man" on duty.[20]

After descending to the lower well bay, plaintiff found that the tree cap he had been sent to remove weighed well over 50 pounds, which was more than those tree caps he had previously removed.[21] To reach the tree cap, plaintiff and Bourgeois had to step off of a catwalk and climb on the tree.[22] Plaintiff had a harness, but Bourgeois did not.[23] The two crew supervisors had not instructed plaintiff and Bourgeois on how to handle the tree cap,[24] but plaintiff was aware of Weatherford's rule requiring the use of machinery to lift objects in excess of 50 pounds.[25]

Plaintiff radioed to the top deck that "we needed the crane because this was – it wasn't a normal lift."[26] He radioed for the crane two or three times.[27] Comeaux instructed plaintiff and Bourgeois via radio to "manhandle [the tree cap]."[28] Face-to-face, plaintiff told Bourgeois that the tree cap's weight made it unsafe to lift, and "let's not do this."[29]

---

[18] R. Doc. No. 54-6, at 23.
[19] R. Doc. No. 54-3, at 2.
[20] R. Doc. No. 63-1, at 1 (Affidavit of Johnny Goodwin, Exxon's Wellwork Superintendent); R. Doc. No. 54-6, at 41.
[21] R. Doc. No. 54-6, at 8, 17. The record suggests that the tree cap weighed 112 pounds. R. Doc. No. 71-3, at 31.
[22] R. Doc. No. 54-6, at 16-17.
[23] R. Doc. No. 54-6, at 36.
[24] R. Doc. No. 54-6, at 16.
[25] R. Doc. No. 54-6, at 4-5.
[26] R. Doc. No. 54-6, at 17.
[27] R. Doc. No. 54-6, at 17.
[28] R. Doc. No. 54-6, at 18.
[29] R. Doc. No. 54-6, at 17-18, 39.

Bourgeois started "grumping," although plaintiff could not make out specific words, and took "it upon himself" to lift the tree cap.[30] Bourgeois began jerking on the tree cap and eventually freed it.[31] Plaintiff unhooked his harness and moved toward Bourgeois because "he was going to need my assistance."[32] Bourgeois beckoned plaintiff, saying, "Goodie, Goodie," and passed the tree cap to plaintiff.[33] Although he experienced back pain, plaintiff was able to carry the tree cap toward the catwalk before dropping it.[34]

The dropped tree cap landed on top of a bandsaw and an air hose, which ruptured and began making "[a] lot of hissing noise."[35] Plaintiff radioed for help, requesting that another employee shut off the air to the hose.[36] In "panic mode," plaintiff moved onto the catwalk and picked up the tree cap in order to move it off of the hose.[37] Plaintiff again experienced back pain and dropped the tree cap.[38]

Plaintiff had been in the lower well bay for approximately three to six minutes before he was injured.[39] Ingle, Comeaux, and Delhomme arrived approximately one minute after the tree cap was removed.[40] Ingle, who had been observing the placement of the wireline lubricator from the top

---

[30] R. Doc. No. 54-6, at 18. Bourgeois testified that he could have asked for the crane, and "I should have, but I didn't." R. Doc. No. 76-3, at 27.
[31] R. Doc. No. 54-6, at 20.
[32] R. Doc. No. 54-6, at 21-23.
[33] R. Doc. No. 54-6, at 24, 30.
[34] R. Doc. No. 54-6, at 28-30, 35, 38.
[35] R. Doc. No. 54-6, at 28.
[36] R. Doc. No. 54-6, at 28.
[37] R. Doc. No. 54-6, at 28.
[38] R. Doc. No. 54-6, at 29.
[39] R. Doc. No. 54-6, at 12, 31-32.
[40] R. Doc. No. 54-6, at 36-37.

deck,[41] arrived first.[42] Because of the distance between the upper deck and the lower well bay, plaintiff testified that Ingle would have had to have started making his way to plaintiff and Bourgeois before plaintiff dropped the tree cap.[43]

Plaintiff filed a complaint on August 2, 2013,[44] and an amended complaint on December 18, 2013, essentially alleging that Exxon and WCL were negligent in that they failed to exercise reasonable care for his safety, created and failed to eliminate hazardous and/or unsafe conditions, negligently operated the platform, failed to adequately train and/or supervise their employees and third parties, failed to use proper equipment, failed to properly supervise work, and failed to warn and/or remedy a premises defect.[45]

## STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions

---

[41] R. Doc. No. 83-1, at 10; R. Doc. No. 83, at 6. Before the wireline lubricator was strapped to the crane, Ingle visited the restroom. R. Doc. No. 83-1, at 10-13. When he returned, the wireline lubricator was attached and being lowered via crane. *Id.* At this point, he descended to the lower well bay. *Id.*

[42] R. Doc. No. 54-6, at 37. There is a genuine issue of fact, although not material fact, as to why Ingle went to the lower well bay. Ingle testified that he went to the lower deck to observe the wireline lubricator operation, R. Doc. No. 83-1, at 13, but plaintiff highlights that Exxon's incident report could be read to suggest that Ingle did so because radio communication was not working. R. Doc. No. 83, at 8 (citing R. Doc. No. 83-7, at 2). Ingle testified that he never heard Goodie's request for a crane. R. Doc. No. 83-1, at 12-13.

[43] R. Doc. No. 54-6, at 37.

[44] R. Doc. No. 1.

[45] R. Doc. No. 32, at 2-3. The Court previously granted Exxon's motion for summary judgment as to plaintiff's premises liability claim. R. Doc. No. 81.


of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

**ANALYSIS**

**I. Exxon**

In its motion for summary judgment, Exxon argues that Weatherford is an independent contractor and that Exxon did not retain operational control over Weatherford's acts or expressly or impliedly authorize those acts.[46] Plaintiff does not dispute that Weatherford is an independent contractor.[47]

Article 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. "[A] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions." *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992) (quotation omitted).[51] "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003). "To determine whether the exception for operational control makes a principal liable, [courts] first examine the extent to which [the principal] contractually reserved the right to control the work." *Id.* "When the contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control." *Id.*

---

[46]R. Doc. No. 63-9, at 10 & n.7 (quoting *Venezia v. ConocoPhillips Co.*, No. 12-2168, 2014 WL 107962 (E.D. La. Jan. 9, 2014)).

[47]*See, e.g.*, R. Doc. No. 69, at 7. A terse statement in plaintiff's opposition suggests that plaintiff may be asserting that Exxon is directly liable. R. Doc. No. 69, at 7. This is insufficient to properly raise the issue. Moreover, plaintiff has not cited any facts specific to this case to support such a theory of liability. Finally, insofar as plaintiff's arguments could be construed as an attempt to impose direct liability, "[t]he considerations that preclude a finding of operational control and by extension, vicarious liability, also compel the conclusion that [Exxon] did not owe an independent duty to [Weatherford's] employees based on the terms of the contract." *Venezia*, 2014 WL 107962, at *10.

The contract between Exxon and Weatherford provides that Weatherford is an independent contractor and that Exxon has no authority to supervise Weatherford.[48] The contract additionally specifically provides that Weatherford is responsible for "training its employees in safe working practices and procedures" and "shall coordinate all safety, health and environmental activities for the job(s) for which Contractor is responsible," including daily inspections of work sites.[49] Moreover, in plaintiff's opposition, plaintiff does not cite to any part of the contract suggesting that Exxon had operational control over Weatherford.[50] Accordingly, the Court finds that Exxon did not retain operational control pursuant to the contract, and "absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal like [Exxon] cannot be liable under the operational control exception." *Id.* (quotation omitted)

Plaintiff's deposition testimony indicates that Weatherford employees instructed plaintiff and Bourgeois to remove the tree cap and later instructed them to "manhandle" it.[51] Plaintiff attempts to circumvent this evidence by alleging that Exxon " expressly and/or impliedly authorized the job in issue to take place with a manual lift by failing to make sure the correct [job safety analysis ("JSA")] was followed, by further failing to make sure the crane was available for mechanically lifting the tree cap, and *inter alia*, by failing to respond appropriately and stop the job when the Plaintiff himself radioed that the tree cap was too heavy to lift by hand. The Court addresses each argument in turn.

---

[48] R. Doc. No. 63-2, at 9.
[49] R. Doc. No. 63-9, at 11-12 (citing R. Doc. No. 63-6, at 4-5).
[50] As Exxon acknowledges, a principal may also be liable for the acts of an independent contractor where the contractor performs ultrahazardous activities on behalf of the principal, but no one contends that ultrahazardous activities were at issue here. R. Doc. No. 63-9, at 10; *see Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 380 (5th Cir. 2001).
[51] R. Doc. No. 54-6, at 9-10, 18.

Plaintiff first contends that Goodwin's presence at the safety meeting and his failure to intervene when the incorrect JSA was used demonstrate Exxon's negligence.[52] The Fifth Circuit has rejected this argument:

> [T]he fact that a principal like [Exxon] reserves the right to monitor its contractor's performance and stations a "company man" on the platform who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his ([Exxon]) superiors, does not mean that the principal controls the methods or details of the contractor's work.

*Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997). Accordingly, Exxon had no duty to intervene when the incorrect JSA was used. Moreover, plaintiff has not cited any evidence to suggest that Exxon impliedly ordered the use of the incorrect JSA. *See Dupre v. Chevron U.S.A. Inc.*, 913 F. Supp. 473, 483 (E.D. La. 1996) (Vance, J.) (There is a "large body of Fifth Circuit precedent finding no 'operational control' despite some knowledge of risk or involvement with safety issues and the presence of 'company men' on the contractor's rig.") aff'd, 109 F.3d 230 (5th Cir. 1997); *see also Woods v. Apache Corp.*, No. 11-1928, 2013 WL 5673606, at *8 (E.D. La. Oct. 17, 2013) (Fallon, J.) (citing *Coulter*, 117 F.3d at 912).

Plaintiff further argues that, "had Exxon properly warned Weatherford and Jonathan Goodie that the tree cap on the well in issue required a mechanical lift," the crane would have been made available for such a lift rather than being loaded with the wireline lubricator.[53] In essence, plaintiff is arguing that it was negligent for the crane to be loaded with the wireline lubricator when the crane was still needed to remove the tree cap.[54] This argument fails because Bourgeois's uncontroverted

---

[52]R. Doc. No. 69, at 14.
[53]R. Doc. No. 69, at 13.
[54]*E.g.*, R. Doc. No. 83, at 7.

deposition testimony shows that the crane could have been unloaded to accommodate the tree cap,[55] and plaintiff has not come forth with any evidence whatsoever that Exxon impliedly or expressly ordered that the crane be loaded with the wireline lubricator before the tree cap could be removed.

Insofar as plaintiff is relying on the theory that Exxon failed to warn him, such a theory is unavailing. Plaintiff argues that Goodwin directed Weatherford employees to place the wireline lubricator into a specific well but did not warn Weatherford or plaintiff that a mechanical lift was a necessary component step in this process.[56] Plaintiff has not identified any evidence, however, that creates a genuine issue of material fact as to whether Goodwin had any duty to warn plaintiff of the tree cap's weight or to issue specific instructions relative to lifting the tree cap. Moreover, to the extent that such a duty may otherwise exist, it was not present in this case because plaintiff was well aware that the tree cap was too heavy to lift when he decided to assist Bourgeois.[57] *See Gutierrez v. Exxon Corp.*, 764 F.2d 399, 402 (5th Cir. 1985) ("Exxon owed a duty to Johnson Tool to warn of any dangerous condition Exxon knew or should have known existed *if* the condition was not reasonably apparent to Johnson Tool's employees.") (emphasis added).

With respect to plaintiff's radioed request for help, whether plaintiff is arguing that Exxon negligently ignored his request for a crane or negligently used faulty equipment such that Goodwin could not hear his request,[58] the result is the same. Exxon's "'company man' did not affirmatively assume any duty to provide [Weatherford's] employees with a safe work place simply by observing

---

[55]R. Doc. No. 76-1, at 14. Bourgeois's uncontroverted testimony also suggests that the crane operator "responds to everyone on the Weatherford team" and would have responded to a request from plaintiff. R. Doc. No. 76-3, at 27-28.
[56]R. Doc. No. 69-7, at 2; R. Doc. No. 69, at 2.
[57]R. Doc. No. 54-6, at 17.
[58]*E.g.*, R. Doc. No. 69, at 10.

their unsafe work habits." *Graham v. Amoco Oil Co.*, 21 F.3d 643, 648 (5th Cir. 1994).[59] In sum, plaintiff has failed to identify an express or implied order by Exxon to engage in the unsafe practice at issue. *See Fruge*, 337 F.3d at 564. More specifically, plaintiff has not identified evidence " that Exxon ever specifically involved itself in the safety of a crane operation" or tree cap removal, other than acting as a passive observer. *See Maxwell v. Nabors Drilling U.S.A., Inc.*, No. 98-1339, 1999 WL 460777, at *3 (E.D. La. June 29, 1999) (Duval, J.) aff'd sub nom. *Maxwell v. Nabors Drilling USA*, 211 F.3d 594 (5th Cir. 2000) (affirming for "essentially the reasons presented below"); *see also id.* at *6-8. Even if Goodwin "arguably could have prevented the accident by interjecting himself into the unsafe situation, he had no such duty to plaintiff and is not liable for failing to do so." *Graham*, 21 F.3d at 647 (quoting *Kent v. Gulf States Utils. Co.*, 418 So. 2d 493, 500 (La. 1982)) (modifications omitted). Accordingly, no genuine issue of material fact exists and Exxon is entitled to summary judgment as a matter of law.

**II. WCL**

According to WCL, although it does not deny that it "owed some duties to the workers on the platform," it did not owe plaintiff the specific duty "to keep him from ignoring his own company's safety rules and better judgment."[60] Although WCL may essentially concede that some duty exists as to plaintiff, plaintiff's allegations relative to the specific nature of any duty owed by WCL are unsupported.

---

[59]Plaintiff does not identify any evidence that Goodwin affirmatively undertook such a duty. Although plaintiff contends that Goodwin "admits to calling for the specific work on the specific well," R. Doc. No. 83, at 6, the deposition testimony to which plaintiff cites states that Goodwin did not recall telling anyone that this particular tree cap needed to be removed from this particular well. R. Doc. No. 83-2, at 26.
[60]R. Doc. No. 88, at 7.

-11-

Plaintiff argues that WCL had a duty to provide third parties with personnel that would actively intervene when confronted with a safety hazard, but plaintiff does not cite any authority to support this argument.[61] To the extent that plaintiff takes the more moderate stance that WCL "owes an obligation toward third persons to refrain from creating an unreasonable risk of harm or hazard," plaintiff has not identified the actions that WCL took to create such a risk.[62] Plaintiff testified that it was a Weatherford employee who ordered plaintiff to go to the lower well bay, a Weatherford employee who allegedly instructed plaintiff to manhandle the tree cap, and a Weatherford employee who initiated the manual lift of the tree cap, notwithstanding plaintiff's prior refusal to do so.[63] *See Gaspard v. Aramark Corp.*, No. 10-131, 2011 WL 1671353, at *3 (E.D. La. May 3, 2011) (Barbier, J.) (granting defendant's summary judgment motion where plaintiff was employed by another entity and was taking orders from that entity at the time that plaintiff lifted a heavy object).

Plaintiff also argues that WCL had a duty to ensure that a crane was available to lift the tree cap and to ensure that plaintiff's radioed report was "honor[ed].[64] However, plaintiff has come forward with no legal argument or evidence to support this allegation, including any evidence that WCL agreed to undertake these duties. *See LeJeune*, 950 F.2d at 270-71 (citing *Lazzell v. Booker Drilling Co., Inc.*, 816 F.2d 196, 198 (5th Cir. 1987)). Moreover, plaintiff did not radio a report on Bourgeois's actions after plaintiff had radioed his own request for assistance.[65] Accordingly, even if Ingle had been monitoring plaintiff's radio transmissions, there would not have been any indication that plaintiff and Bourgeois were proceeding with lifting the tree cap before a crane could

---

[61]R. Doc. No. 69, at 8.
[62]R. Doc. No. 69, at 7.
[63]R. Doc. No. 54-6, at 9-10, 18.
[64]R. Doc. No. 69, at 9.
[65]R. Doc. No. 54-6, at 23.

be provided. In sum, there is no indication that Ingle owed plaintiff a duty to monitor his radio transmissions or that Ingle's failure to do so caused plaintiff's injury.

After taking Ingle's deposition, plaintiff argued that the alleged inadequacy of Ingle's qualifications and experience show that WCL acted negligently in assigning him as a safety supervisor.[66] However, as noted above, plaintiff cites no law or evidence to suggest that Ingle had a duty to actively intervene. Accordingly, plaintiff fails to anchor his argument relative to Ingle's qualifications to any duty owed to plaintiff or any breach thereof. Similarly, plaintiff's argument that Ingle should not have left his observation of the critical lift from the top deck to go to the restroom is divorced from the facts of the case – namely, that plaintiff's accident occurred in the lower well bay, rather than the upper deck.[67]

Plaintiff suggests that Ingle had a duty to plaintiff arising from the contract between Exxon and WCL, which provides that WCL "shall protect the health and safety of [WCL's] Subcontractors' and [Exxon's] employees, the public, and other third parties from any danger associated with the Services."[68] Services are defined to include providing safety supervisors,[69] but there is no indication that providing such a supervisor carried with it an associated danger that gave rise to plaintiff's

---

[66]R. Doc. No. 83, at 2.
[67]R. Doc. No. 83, at 7. Plaintiff does not allege that Ingle had a duty to be present in the lower well bay rather than the top deck at the time of plaintiff's accident or that WCL had a duty to provide two safety advisers.
[68]R. Doc. No. 85, at 3 (citing R. Doc. No 85-3, at 15).
[69]R. Doc. No. 85-3, at 16.

injury.[70] Even if a duty might otherwise exist, WCL persuasively asserts that, as discussed above, there is no duty to warn of a known hazard.[71]

Finally, WCL has also moved for summary judgment on the basis that the actions of Bourgeois serve as a superseding cause that relieves WCL of liability.[72] Plaintiff has not offered any evidence or legal authority to oppose this argument. Accordingly, this unopposed argument provides an additional basis on which to grant WCL's motion in its entirety. *See Graham*, 21 F.3d at 648-49.

## CONCLUSION

Plaintiff's assertion that Exxon is vicariously liable for the actions of Weatherford employees ignores the fact that there is no evidence of an express or implied order from Exxon for those employees to engage in the allegedly unsafe conduct at issue. Moreover, plaintiff has offered no legal authority for his allegation that Exxon and WCL had an affirmative duty to provide employees who would intervene relative to the allegedly unsafe conduct of Weatherford employees. Finally, plaintiff's failure to oppose WCL's argument relative to superseding causation renders that argument an alternative basis for summary judgment as to WCL. The Court concludes that there is no genuine issue of material fact, and Exxon and WCL are entitled to judgment as a matter of law.

---

[70]Plaintiff relies on *Wicker v. Harmony Corp.*, 784 So. 2d 660 (La. App. 1st Cir. 2001), but that case is distinguishable for several reasons, including the fact that the contractual provision on which that case turned imposed a broad duty to ensure the safety of employees. *Id.* at 665-66.
[71]*See* R. Doc. No. 54-1, at 11.
[72]R. Doc. No. 54-1, at 19. "A superseding or intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury. *Johnson v. Morehouse Gen'l Hosp.*, 63 So. 3d 87, 116 (La. 2011). [A] superseding cause is technically the last act of negligence and is usually determined to be the sole cause of the injury." *Id.* at 117.

Accordingly,

**IT IS ORDERED** that the motions are **GRANTED**

New Orleans, Louisiana, May 2, 2014.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**